AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California


FILED
NOV 27 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One Motorola Moto Z Force cellular phone, IMEI #: 356503080969184, seized as line item 3 under FPF No. 2020250400017001

Case No. **19MJ5307**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of a Controlled Substance; Conspiracy to Import Controlled Substances |

The application is based on these facts:

See attached Affidavit of Special Agent Matthew Steuernagel

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent Matthew Steuernagel, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/27/19

_____
Judge's signature

City and state: San Diego, CA

Hon. Jill L. Burkhardt
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Steuernagel, Special Agent of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), being duly sworn, hereby state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a warrant to search the following electronic devices:

> One Motorola Moto Z Force cellular phone, IMEI #: 356503080969184,
> seized as line item 3 under FPF No. 2020250400017001 **(Target Device)**,
> described in Attachment A (incorporated herein by reference);

seized from Erika Jasmin RAMIREZ on October 19, 2019, incident to her arrest for importation of Methamphetamine at the San Ysidro, California Port of Entry (POE) and which is currently in the possession of HSI DSAC Vault located at 2255 Niels Bohr Court, San Diego, CA 92154.

2. I seek authority to search the Target Device for evidence of crimes from July 17, 2019, through October 19, 2019, specifically, violations of Title 21, United States Code, Sections 952, 960, and 963, as described in Attachment B (incorporated herein by reference.)

3. The information contained in this affidavit is based upon my experience and training, and in consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause. Dates, times and amounts are approximate.

//
//
//

## EXPERIENCE AND TRAINING

4. I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I have been employed by ICE/HSI as a Special Agent since November 2018. Prior to becoming a Special Agent, I served as a Federal Air Marshal with the Federal Air Marshal Service from 2009 to 2018. I also served as a Parole Officer with the Ohio Adult Parole Authority from 2005 to 2008.

5. I earned a dual Bachelor of Arts degree in Criminal Justice Studies and Applied Conflict Management from Kent State University in 2002. Additionally, I earned a Master of Arts degree in National Security and Strategic Studies from the United States Naval War College in 2018.

6. As a Special Agent for HSI, I am responsible for investigating laws enumerated in Title 8, Title 18, Title 19 and Title 21 of the United States Code. Included in my responsibilities is the investigation of illicit contraband-smuggling, including narcotics-smuggling, across the United States border.

7. I have completed and graduated from the twelve-week Criminal Investigator Training Program as well as the fifteen-week Homeland Security Investigations Special Agent Training Program located at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. I have completed and graduated the Federal Air Marshal Training Program ("FAMTP") Phase I, located at the FLETC in Artesia, New Mexico, and FAMTP Phase II, located the Federal Aviation Administration's William J. Hughes Technical Center in Egg Harbor Township, New Jersey. I have also completed the Ohio Department of Rehabilitation and Corrections' Basic Training Program and Parole Officer Training Program, located in Orient, Ohio.

8. Since June of 2019, I have been assigned to a HSI Contraband Smuggling Group in San Ysidro, California. My duties include investigating the illicit trafficking of controlled substances into the United States. During my assignment to the Contraband

Smuggling Group, I have participated in the investigation of drug trafficking organizations involved in the acquisition, importation, transportation, and distribution of controlled substances into and through the Southern District of California.

9. In the course of my duties, I have been a case agent directing drug-related investigations. I have participated in many aspects of criminal investigations including reviewing evidence and conducting physical and electronic surveillance. I have interviewed defendants while conducting various investigations. I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers, with particular emphasis on those who attempt to import narcotics into the United States from Mexico at the San Diego international ports of entry.

10. Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers, portable radios and GPS devices to maintain communication and location information with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distribution amount quantities of controlled substances, such as methamphetamine and cocaine. Typically, load drivers smuggling controlled substances across the border are in telephonic contact with co-conspirators immediately prior to, during and following the crossing of the narcotic load, at which time they receive instructions on how to cross and where and when to deliver the controlled substance. Narcotics smugglers and their organizations use cellular, digital, and satellite telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular, digital, and satellite telephones.

11. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. This

statement is made in support of an application for a warrant to search a cellular telephone that is believed to contain evidence of violations of 21 U.S.C. §§ 952, 960, and 963.

12. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not contain all of the information known to federal agents regarding this investigation. Instead it contains only those facts believed to be necessary to establish probable cause. In addition, information contained in this affidavit is based upon reviews of official reports and records, upon conversations with other Homeland Security Investigations Special Agents, and my personal observations and knowledge. When the contents of documents or statements of others are reported herein, they are reported in substance and in part unless otherwise indicated.

13. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, I am also aware that:

   a. Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

   d. Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

   f. Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

       g.    The use of cellular telephones by conspirators or drug smugglers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

    14.    Subscriber Identity Module (SIM) Cards also known as subscriber identity modules are smart cards that store data for GSM cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

    15.    Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

       a.    tending to indicate efforts to import methamphetamine, or some other federally controlled substances from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

       b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substances from Mexico into the

5

United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

  c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

  d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substances from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

**A.  The Arrest**

16. On October 19, 2019, at approximately 0:10 a.m., Customs and Border Protection ("CBP") Officer E. Franco was conducting pre-primary roving operations with his assigned Narcotics Human Detector Dog (NHDD) "Junga" at the San Ysidro Port of Entry. According to Officer Franco's report, Junga alerted to a trained narcotic odor at the rear passenger door seam of a white Dodge Journey with California license plate 8KCB363 in vehicle lane 19 ("the vehicle"). Erika Jasmin RAMIREZ ("RAMIREZ"), a United States citizen, was the driver, sole occupant, and registered owner of the vehicle. CBPO M. Rice responded and escorted the vehicle to the secondary lot for further inspection.

17. CBPO M. Rice asked RAMIREZ where she was coming from and what her destination was. RAMIREZ replied she went to Tijuana to drop off a friend, and that she

was going to Beyer Boulevard in San Ysidro, California. RAMIREZ confirmed she was the registered owner of the vehicle.

18. The vehicle was driven through the Z Portal and no anomalies were noted. CBPO Rice opened the driver side door and noticed a black handgun, later identified as an airsoft gun, in the pocket of the driver's door. RAMIREZ was removed from the vehicle, handcuffed, and escorted to the security office.

19. CBPO V. Tovar conducted a further inspection of the vehicle and discovered a black cloth bag under the passenger front seat. There was a hard object inside the bag. CBPO Tovar opened the bag and saw a red fire extinguisher. CBPO Tovar shook the fire extinguisher, and it made a rattling sound not consistent with a normal fire extinguisher, as if there were rocks or sand inside. CBPOs ran the fire extinguisher through the X-Ray but results were inconclusive.

20. CBPO Tovar then attempted to deploy the fire extinguisher, but it did not release any fire retardant. CBPOs tried to open the fire extinguisher but the nozzle was overly tight and appeared glued shut. Using tools, CBPOs eventually opened the fire extinguisher and observed a plug glued into the top. CBPOs punched a hole in the cap and saw clear plastic bags inside. Officers removed multiple empty bags and one bag with a white powdery substance that tested positive from properties of methamphetamine. The total weight of methamphetamine was 1.26 kilograms.

21. Officers placed RAMIREZ under arrest for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of a Controlled Substance. The **Target Device** was seized from RAMIREZ subsequent to her arrest. No prior attempts to download the **Target Device** have been made.

22. RAMIREZ is charged with importation of a controlled substance (methamphetamine) in violation of Title 21, United States Code sections 952 and 960 in the Southern District of California in case number 19cr4580-DMS. A motion hearing in this case is set for December 13, 2019, in front of the Honorable Dana M. Sabraw.

//

**B.  RAMIREZ's Statement**

23.  On October 19, 2019, at approximately 4:29 a.m., RAMIREZ was advised of her *Miranda* rights and elected to make a statement. RAMIREZ stated that she lives in San Diego and is currently unemployed. RAMIREZ confirmed that the white Dodge Journey is her vehicle, and that she owned it since approximately February of last year.

24.  RAMIREZ claimed she crossed into Mexico at the Otay Mesa POE driving the vehicle at approximately 9:00 p.m. on October 18, 2019, to give a ride to her neighbor, Maria Fernandez Pena. RAMIREZ said that Fernandez lives in an apartment complex down the street from her in San Diego. According to RAMIREZ, Fernandez did not feel well and needed a ride to her boyfriend's house in Tijuana. Fernandez's boyfriend's name is "Louis," but RAMIREZ does not know his last name.

25.  RAMIREZ claimed she does not know where Louis lives, but she drove Fernandez to Louis's house based on directions Fernandez provided. Once they arrived, RAMIREZ went inside to use the restroom. A relative of Louis's, "Jose Gomez," asked her for a ride to the border, and RAMIREZ agreed. She claimed she did not recall if Gomez was carrying a bag. RAMIREZ dropped off Gomez on the Mexican side of the San Ysidro POE near a big ball-shaped monument.

26.  Agents asked RAMIREZ where the fire extinguisher came from. RAMIREZ responded that she did not know there were drugs in the vehicle until the agents told her. Agents pointed out that they did not say the drugs were found inside the fire extinguisher. RAMIREZ claimed she had never seen the fire extinguisher before, and did not know where it came from. RAMIREZ claimed Fernandez put cookies in her car while she was using the restroom.

27.  Agents asked RAMIREZ for Fernandez's phone number. RAMIREZ claimed she did not remember it, but that it was in her phone. She scrolled through her contacts in the **Target Device** and then stated she was unable to find it.

8

28. RAMIREZ said that she "never crossed to TJ much." She claimed the last time she went to Mexico was to visit her family in September 2019, and that she crossed in Nogales, Arizona.

## C. Crossing History

29. A copy of the California DMV registration found in the vehicle at the time of arrest lists Erika RAMIREZ as the registered owner of the 2018 Dodge vehicle. The registration was issued on March 28, 2019. A review of RAMIREZ's crossing history in the smuggling vehicle indicates that she had approximately 10 crossings in the same vehicle before her arrest on October 19, 2019. RAMIREZ crossed on the following days:

| Date | Port | Manner |
|---|---|---|
| May 6, 2019 | Nogales, AZ | 2018 Dodge |
| May 7, 2019 | Nogales, AZ | *pedestrian* |
| June 15, 2019 | Nogales, AZ | 2018 Dodge |
| June 16, 2019 | Nogales, AZ | 2018 Dodge |
| July 17, 2019 | San Ysidro, CA | 2018 Dodge |
| September 7, 2019 | San Ysidro, CA | 2018 Dodge |
| September 15, 2019 | San Ysidro | *2015 Volkswagen* |
| September 22, 2019 | Nogales, AZ | 2018 Dodge |
| September 23, 2019 | Nogales, AZ | 2018 Dodge |
| September 26, 2019 | Nogales, AZ | 2018 Dodge |
| September 27, 2019 | Nogales, AZ | *pedestrian* |
| September 28, 2019 | Nogales, AZ | 2018 Dodge |
| September 29, 2019 | Nogales, AZ | 2018 Dodge |

30. RAMIREZ's crossing history indicates crossings at San Ysidro in July and September 2019. Notably, her 2018 Dodge crossed into Mexico via Otay Mesa POE on July 16, 2019, at 4:56 p.m. Approximately eight hours later, on July 17 at 00:52 a.m., RAMIREZ drove it back into the United States via the San Ysidro POE. She was the sole occupant of the vehicle during that crossing.

31. Similarly, on September 6, 2019, the Dodge went to Mexico via San Ysidro at 11:31 p.m. Less than an hour later, at 00:18 a.m. on September 7, RAMIREZ alone drove it back into the United States through the San Ysidro POE. On September 15, 2019, at 3:50

9

a.m., RAMIREZ also crossed from Mexico at San Ysidro in a different vehicle, a 2015 Volkswagen. There were two more occupants in the car.

32. RAMIREZ claimed that the she went to Tijuana on the evening of October 18, 2019, because her neighbor, Maria Fernandez, was not feeling well and needed a ride. RAMIREZ provided her address as 3823 Fruitland Place, San Ysidro, CA, and stated that Maria Fernandez lives down the street. I have since identified a Maria Fernandez with an address 3835 Fruitland Place, San Ysidro, CA. Fernandez has multiple crossings at San Ysidro, as well as Otay Mesa and Arizona POEs. Notably, on September 29, 2019, both Fernandez and RAMIREZ crossed into the United States at Nogales, Arizona, within thirty minutes of each other: RAMIREZ arrived at 1:10 a.m., driving the 2018 Dodge, and Fernandez crossed in another vehicle at 1:40 a.m. Similarly, on October 19, 2019, the day of RAMIREZ's arrest, the two women crossed arrived at the San Ysidro POE within minutes of each other: Fernandez crossed as a pedestrian at 00:14 a.m., while RAMIREZ arrived at the primary vehicle lane around 00:17 a.m. Based on this, I believe RAMIREZ, Fernandez, and others yet unknown may have been engaged in a drug smuggling conspiracy.

33. Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe that the **Target Device** was used to coordinate the importation of methamphetamine into the United States. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular/mobile telephones can be used as a Global Positioning Device (GPS) by Drug Trafficking Organizations (DTO's) to track the location of smuggled drugs in real-time. The cellular/mobile telephone may be concealed within natural voids or aftermarket compartments within a vehicle used for drug smuggling. The GPS information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone.

34. In addition, I know that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Device** may identify the persons involved in narcotics trafficking activities, including RAMIREZ. Furthermore, it is likely the **Target Device** may contain incriminating information pertaining to the smuggling event. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of RAMIREZ, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**.

35. Finally, I also know that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. This planning often includes coordination on crossing the border to develop a crossing history or pattern. In my professional experience, narcotics trafficking activities involve planning and coordination in the weeks and often months prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine the whereabouts of their cargo.

36. In this case, RAMIREZ is the registered owner of the vehicle and claims she has owned it since February 2018. The current registration card was issued on March 28, 2019. RAMIREZ first crossed in the vehicle from Mexico into the United States on May 6, 2019, and had approximately 9 more crossings until the day of her arrest on October 19, 2019. RAMIREZ claimed she did not go to Tijuana, yet she crossed in the vehicle at San Ysidro in July and September 2019. Notably, it appears she took short trips to Mexico on July 16 (eight hours) and September 6 (less than an hour). Additionally, RAMIREZ and Maria Fernandez had coordinated crossings from Mexico on September 29, 2019, and on the date of RAMIREZ's arrest, October 19, 2019. The evidence supports that probable

cause exists to search the **Target Device** for information dating back to July 17, 2019, the date RAMIREZ first crossed the vehicle from Mexico at San Ysidro POE. This date is approximately three months prior to RAMIREZ's crossing in the vehicle that lead to her arrest.

## **METHODOLOGY**

37. It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

38. Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within

the telephones and memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

39. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

40. Based on all of the facts and circumstances described above, there is probable cause to conclude that the **Target Device** was used to facilitate violations of Title 21, United States Code, Sections 952, 960, and 963.

41. Because the **Target Device** was seized during the investigation of RAMIREZ's smuggling activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by RAMIREZ continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from July 17, 2019, through October 19, 2019.

42. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Matthew Steuernagel
Special Agent

Subscribed and sworn to me before this __27__ day of November, 2019.

_____
The Honorable Jill L. Burkhardt
United States Magistrate Judge

13

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

One Motorola Moto Z Force cellular phone, IMEI #: 356503080969184, seized as line item 3 under FPF No. 2020250400017001

("TARGET DEVICE")

currently in the possession of the HSI DSAC Vault located at 2255 Niels Bohr Court, San Diego, CA 92154.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of July 17, 2019, up to and including October 19, 2019.

a. tending to indicate efforts to import methamphetamine, or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the importation of methamphetamine, or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.